# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA MEDINA, on behalf of Minor I.I.M., <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | Case No.  1:21-cv-01441-AWI-SAB <br><br> **FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING ACTION TO COMMISSIONER FOR FURTHER PROCEEDINGS** <br><br> (ECF Nos. 15, 17, 18) <br><br> **OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

## I.

## INTRODUCTION

Patricia Medina, on behalf of Minor Plaintiff I.I.M. ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff's application for supplemental security income ("SSI") benefits pursuant to the Social Security Act.  The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.  For the reasons set forth below, the Court recommends that Plaintiff's Social Security appeal be granted and that the action be remanded to the Commissioner for further proceedings.

///

1

**II.**

**BACKGROUND**[1]

On January 31, 2019, a Title XVI application for SSI was protectively filed on behalf of Plaintiff, who was ten years old at the time, alleging a period of disability beginning on February 23, 2015.  (See Admin. Rec. ("AR") 173–91, 200–30, ECF No. 13-1.)  Plaintiff's application was initially denied on April 18, 2019, and denied upon reconsideration on August 2, 2019.  (AR 47, 59.)  On November 4, 2020, Plaintiff appeared via phone teleconference, due to the extraordinary circumstance presented by the Coronavirus pandemic, for a hearing before Administrative Law Judge Diane S. Davis (the "ALJ").  (See AR 21.)  Plaintiff and his mother, Patricia Medina, represented by counsel, testified during the telephonic conference with the assistance of a Spanish interpreter.  (See id.)  Dr. Nancy Winfrey, Ph.D., an impartial medical expert, also testified at the hearing.  (See id.)  After the hearing, the record remained open for Plaintiff to supplement the record with medical notes from Dr. Asarulislam Syed.  (See id. (citing Ex. 9F, AR 367–72).)  On January 28, 2021, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 15–31.)  The Appeals Council denied Plaintiff's request for review on July 29, 2021.  (AR 1–8.)

Plaintiff initiated this action in federal court on September 27, 2021, and seeks judicial review of the denial of his application for SSI benefits under Title XVI.  (ECF No. 1.)  The Commissioner lodged the administrative record on May 19, 2022.  (ECF No. 14.)  On May 31, 2022, Plaintiff filed an opening brief.  (ECF No. 15.)  On July 13, 2022, Defendant filed a brief in opposition.  (ECF No. 17.)  On July 26, 2022, Plaintiff filed a reply.  (ECF No. 18.)

///

///

---

[1] For ease of reference, the Court will refer to the administrative record by the pagination provided by the Commissioner and as referred to by the parties, and not the ECF pagination.  An independent review of the record reveals the transcript of the telephonic hearing (referenced by the parties as AR 37–62) is not included in the administrative record lodged with the Court, though the record otherwise appears complete; consequently, the parties' references to the records appears misaligned.  Regardless, because of the limited issues presently before it, the Court has determined that all portions of the record relevant to the instant matter was submitted to the Court and such is deemed sufficient for purposes of determining the limited issue presently before it.  To the extent that the pagination of the administrative record lodged with the Court differs from that referenced by the parties, however, the parties are advised that the Court shall refer to the pagination of the administrative record lodged with the Court.  The Court will refer to the parties' briefings by their ECF pagination.

# III.

## LEGAL STANDARD

### A.     The Disability Evaluation Under Childhood Standards

An individual under the age of eighteen will be considered disabled if they have "a medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906. The Social Security regulations provide a three-step process in determining whether a child is disabled. See 20 C.F.R. § 416.924. First, the ALJ must determine whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a). If the child is not engaged in substantial gainful activity, then the analysis proceeds to step two. Step two requires the ALJ to determine whether the child's impairment or combination of impairments is severe. Id. The child will not be found to have a severe impairment if it constitutes a "slight abnormality or combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c). However, if there is a finding of severe impairment, the analysis proceeds to the final step. Step three requires the ALJ to determine whether the impairment or combination of impairments "meets, medically equals or functionally equals" the severity of a set of criteria for an impairment in the Listing of Impairments ("listings"). 20 C.F.R. § 416.924(d).

If an impairment does not meet the requirements of, or is not medically equal to, a listed impairment, the claimant may still be disabled if his impairment or combination of impairments is found to be "functionally equivalent" to a listed impairment. In child disability cases, a "whole child approach" is used to determine functional equivalence. R.S. by & Through Herrera v. Berryhill, 357 F. Supp. 3d 1033, 1037 (C.D. Cal. 2019). That is, the ALJ considers all of the child's activities, "everything [the child does] at home, at school, and in [the] community." 20 C.F.R. § 416.926a(b). Functional equivalence is measured by assessing the claimant's ability to function in the following six domains, which are "broad areas of functioning intended to capture all of what a child can or cannot do": (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating

objects; (v) caring for yourself; and (vi) health and physical well-being. 20 C.F.R. §§ 416.926a(b)(1)(i)–(vi).   Limitations in functioning must result from the child's medically determinable impairments.  See 20 C.F.R. § 416.924a (describing considerations for determining disability for children).  An impairment or combination of impairments is functionally equivalent to a listing if it results in "marked" limitations in two areas, or an "extreme" limitation in one area of functioning.[2]  20 C.F.R. § 416.926a(a).

### B.    Standard of Review

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  The Court reviews only those issues raised by the party challenging the decision.  See Lewis v. Apfel, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  In reviewing an ALJ's decision regarding a child's functional equivalence, the Court considers whether it is supported by substantial evidence.  See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003) (reviewing ALJ's functional-equivalence determination under substantial-evidence standard).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart (Thomas), 278 F.3d 947, 954 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)); see also Dickinson v. Zurko, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly erroneous standard).  "[T]he threshold for such evidentiary sufficiency is not high."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  Rather, "[s]ubstantial evidence means more than a scintilla, but less than a preponderance; it is an extremely deferential standard."  Thomas v. CalPortland Co. (CalPortland), 993 F.3d 1204, 1208

---

[2] A "marked" limitation is one that "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2).  It is "more than moderate" but "less than extreme."  Id.  A child's "day-to-day functioning may be seriously limited when [his or her] impairment(s) limits only one activity or when the interactive and cumulative effects of [his or her] impairment(s) limit several activities."  Id.  It "is the equivalent of the functioning [the Commissioner] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  Id.  An "extreme" limitation "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3).  It is the rating given to "the worst limitations."  Id.  Nonetheless, it "does not necessarily mean a total lack or loss of ability to function."  Rather, it is "the equivalent of the functioning [the Commissioner] would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  20 C.F.R. § 416.926a(e)(3)(i).

(9th Cir. 2021) (internal quotations and citations omitted); <u>see also</u> <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ has erred, the Court may not reverse the ALJ's decision where the error is harmless.  <u>Stout v. Comm'r of Soc. Sec. Admin.</u>, 454 F.3d 1050, 1055–56 (9th Cir. 2006).  Moreover, the burden of showing that an error is not harmless "normally falls upon the party attacking the agency's determination."  <u>Shinseki v. Sanders</u>, 556 U.S. 396, 409 (2009).

Finally, "a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  <u>Hill v. Astrue</u>, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  However, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's; rather, if the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  <u>Ford v. Saul</u>, 950 F.3d 1141, 1154 (9th Cir. 2020) (quoting <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005)).

**IV.**

**RELEVANT EVIDENCE**

**A.     Medical and Academic Records**

Plaintiff alleges disability based on ADHD, with an alleged onset date of February 23, 2015.  (AR 38, 173, 180, 201.)  He was six years old at this time.  The schools' team for student success ("TSS") conducted meetings in February and October 2015 due to concerns that Plaintiff was showing very limited growth and was struggling with grade level materials even after sixty minutes of targeted intervention daily.

A teacher questionnaire completed on January 12, 2016, noted Plaintiff was not making adequate progress in the general education setting and displayed immature behavior, that he required extra support on a daily basis to complete assigned work, did not come to class prepared and did not make good use of his time in class.  (AR 303–04.)  The report also indicated Plaintiff needed frequent breaks.  It was reported that Plaintiff was very social, but his parents reported he was too shy.  It was also reported that Plaintiff had below average performance in student participation, student motivation, and classroom behavior.  Plaintiff was interviewed and reported

5

he liked drawing pictures, playing with playdough, and toys; he indicated that his friends were nice and he liked to play with them at recess; and he stated reading was his favorite subject while math was the hardest subject.  The teacher reported Plaintiff had difficulty with language arts and math.

Plaintiff's school completed a psychological evaluation report on February 4, 2016, due to concerns with Plaintiff's academic performance in English language arts and math.  (AR 309.)  On the Wechsler Nonverbal Scale of Ability (WNV), an individually administered, nonverbal standardized and norm-referenced measure of cognitive functions for children that is designed to give an overall composite score that represents general intellectual ability (*i.e.*, a Full Scale Intelligence Quotient, or "FSIQ" test), he obtained an FSIQ score of 74, which is within the "borderline" classification.  (Id.)  On multiple other tests measuring cognitive ability, Plaintiff scored in the poor and below average ranges.  (Id.)  The school psychologist, Kristin Lish, M.A., PPS concluded Plaintiff "does qualify for special education services due to a severe discrepancy between ability and academic performance in reading and written expression."  (AR 309–10.)

An Individual Educational Plan ("IEP") was enacted to help Plaintiff address his educational needs.  Until February 12, 2017, Plaintiff was to receive special education teaching in the general education classroom for thirty minutes every day; to spend 54% of his time in general education; and to receive special accommodations such as simple repetitive directions, orally presented questions or items, answer choices read aloud, fewer items on a page, extended time to complete tests and assignments, and increased verbal response time.  (AR 284–93.)

Plaintiff was tested for IEP again in February 2018, at age nine.  The IEP testing yielded results that Plaintiff had a specific learning disability.  It reported Plaintiff was unable to learn and retain new skills and information at a reasonable pace.  He was easily distracted and often distracted others in the classroom.  But it was also reported Plaintiff had good attendance and was able to communicate well with adults and peers, and was able to care for all of his personal needs on the school campus.  It was determined that Plaintiff needed the assistance of both a special education teacher and a general education teacher to improve his reading fluency and reading comprehension skills, writing, math, and social/emotional skills.  (AR 266–82.)

Another IEP was enacted to help Plaintiff address his educational needs.  Plaintiff was to remain in general education 100% of the time, but be provided special education services (primary specialized academic instruction) from February 7, 2018 through February 6, 2019, for ninety minutes every day from special education staff.  Plaintiff was also provided special accommodations, such as placement in a seat away from distractions/noise, extended time on tests and to complete assignments, frequent breaks, tests at the most beneficial times and in small groups; he would be presented fewer items on a page, have answer choices read aloud, questions or items presented orally, receive simple repetitive directions, frequent checks for understanding, tasks presented in small chunks, would be provided increased verbal response time, would receive no penalty for spelling or grammar except on spelling or grammar tasks, and had permission to use notes on tests or quizzes.

Plaintiff received educational progress reports on March 23, 2018, June 4, 2018, October 19, 2018, January 18, 2019, and March 22, 2019.  (AR 311.)

A report card from the term period August 15, 2018 through October 12, 2018, showed, of non-letter graded sections: nine "needs improvement" and four "satisfactory" marks; and of the letter graded sections (A–F): five "C-minuses" and one "C-plus."  (AR 314.)  The report card noted Plaintiff struggled with following the rules on the playground/yard, made poor use of class time, and was not working to potential.  (AR 313.)

A report card from term period October 12, 2018 through December 21, 2018, yielded two "satisfactory," eight "unsatisfactory," and four "needs improvement" marks, one "C," one "C-minus," two "Ds," and two "D-minuses."  The report card commented again that Plaintiff struggled with following the rules on the playground/yard, made poor use of class time, and was not working to potential, and also noted that Plaintiff struggled to stay on task and did not listen to substitutes.

On January 31, 2019, Plaintiff filed his SSI application.  He was ten years old at that time.  (AR 173, 180; see AR 169.)  Plaintiff's mother completed a function report for Plaintiff.  She reported Plaintiff's ability to communicate and to progress in learning was potentially limited.  (AR 211–12.)  She indicated Plaintiff was able to make friends, generally get along with her or

other adults and schoolteachers, play team sports, choose his own clothes, and help around the house.  (AR 214–15.)  However, Plaintiff's mother indicated Plaintiff could not pick up and put away toys by himself, that he did not do what he was told most of the time or obey safety rules, and did not accept criticism or corrections.  (AR 215.)  She reported Plaintiff could not keep himself busy on his own, finish things he started or work on his own arts and crafts projects, but that he could complete homework and complete his chores most of the time.  (AR 216.)

On March 5, 2019, Plaintiff treated at Omni Family Health with the assistance of an interpreter.  (AR 343.)  Plaintiff's mother reported she and Plaintiff's father separated last year, that Plaintiff's father verbally and physically abused Plaintiff, that Plaintiff witnessed domestic violence between his father and mother, and that Plaintiff was academically delayed and had received F grades in school.  (AR 345–46.)  She also reported that Plaintiff got mad easily and didn't have control of his anger, that he would push her and twist her arms back and "smack" her. Plaintiff's mother also reported Plaintiff had behavioral issues in school and had a history of fighting and being defiant against his teachers; that he was suspended for fighting; that he suffered from anger outbursts and became hysterical; he would slam doors, punch the walls and doors, and become physically aggressive towards his mother and siblings.  (AR 344–45.) Plaintiff's mother reported Plaintiff had a history of breaking phones and toys at his house. Plaintiff would also punch with closed fists on his own legs, face, and head; Plaintiff demonstrated the bruises on his legs from punching himself.  When interviewed, Plaintiff stated he had a good relationship with everyone in the home—his mother, sister, two brothers, and nephew—but that he would get "beat up" by his older brother.  He stated he enjoyed playing with his siblings.  Plaintiff was diagnosed with intermittent explosive disorder.  (AR 346–47.)

On March 21, 2019, Plaintiff (age ten) underwent a comprehensive psychological evaluation with Dr. Megan Williamson, Psy.D.  (AR 333.)  Dr. Williamson reviewed Plaintiff's medical and school records, including the IEP test from February 6 2018.  (Id.)  Plaintiff was observed as dressed neatly and appropriately for the weather, his clothes were clean and well-maintained, and his speech was within normal limits.  (Id.)  Plaintiff's mother brought Plaintiff to the appointment on time and spoke through a Spanish interpreter.  (Id.)   Plaintiff's mother

reported Plaintiff had difficulty focusing and concentration, was easily distracted, often lost items and misplaced things, became frustrated easily, had difficulty organizing material and you would often have to call his name multiple times to get him to respond.  (AR 334.)  She reported Plaintiff would often rush through work making simple mistakes; he was unable to complete three-step instructions and would forget a piece; he was hyper, impulsive, and frustrated; and he would hit himself on the head and legs.  She reported Plaintiff's symptoms got worse after his father left the household.  She reported Plaintiff had therapy sessions at Omni Family Mental Health and was in the process of requesting a psychiatrist.  (Id.)  Plaintiff has an older sister (by eight years), an older brother (by five years) and a younger brother (by one year) and he fights with them all.  (Id.)

Dr. Williamson conducted a mental status examination, which  yielded: gross and fine motor function intact based on casual observation; remarkable nonverbal behaviors; Plaintiff had difficulty sitting still and focusing.  (AR 335–36.)  Plaintiff was cooperative; his behavior was appropriate to setting.  (AR 336.)  His attention and concentration were impaired.  (Id.)  Language intact; speech within normal limits; rate of speech and volume were within normal limits; thought content was within normal limits; and associations were logical and goal-oriented.  (Id.)  Judgment and insight were poor and younger than expected given his age.  (Id.)  Mood was euthymic; adequate for the setting with an adequate range; affect was mood congruent.  (Id.)  Dr. Williamson administered the Wechsler Intelligence Scale for Children-V (WISC-V) test.  (AR 333, 336.)  The test yielded "Extremely Low" performance results in the categories of verbal comprehension (individual score of 59) visual spatial (individual score of 53), and fluid reasoning (individual score of 64); "borderline" results in the working memory area (individual score of 79); and "Low Average" results in processing speed (individual score of 80).  (AR 336–37.)  Plaintiff's overall FSIQ score was 59, which falls within the "Extremely Low" range.  (AR 337.)  Based on these test results, Dr. Williamson concluded Plaintiff is functioning in the intellectually disabled range of intelligence with a full scale IQ score of 59.  (Id.)  This score places Plaintiff in the lower view 5% of the overall population.  (Id.)  Dr. Williamson diagnosed Plaintiff with ADHS, combined type, and specific learning disorder.  (Id.)  These symptoms appear to cause

moderate impairments in his day-to-day functioning.  (Id.)  As to functionality, Dr. Williamson opined Plaintiff was mildly impaired in ability to communicate by understanding, initiating, and using language in an age-appropriate manner, and to maintain appropriate conduct in the community.  (AR 338.)  Plaintiff was mild-to-moderately impaired in his ability to relate to peers and adults in an age-appropriate manner.  (Id.)  Plaintiff was moderately limited in his ability to engage in sustained activity for a period of time, and engage in school and play and perform activities of self-care in an age-appropriate manner.  (Id.)

On April 3, 2019, Plaintiff was treated by Dr. Asarulislam Syed M.D., of the Neurology and Psychiatry department.  Plaintiff was seen, with an interpreter, and evaluated for psychotropic medications.  (AR 349–51.)  At that time, Plaintiff was taking bupropion HCI 75mg every morning.  (AR 349.)  Plaintiff reported a history of moderate symptoms, having an irritable mood on some days with rapid mood changes, and getting violent and aggressive.  (AR 348.)  Plaintiff reported he stays awake and cannot sleep, or has interrupted sleep.  (Id.)  An exam revealed Plaintiff was fairly well-groomed, cooperative and had a positive attitude.  (Id.)  He was alert and oriented; had normal speech that was not pressured; thought process was fairly goal-directed; and an intense affect.  (Id.)  Dr. Syed found no flight of ideas or loosening of associations, no obvious delusion, hallucinations, or preoccupation with traumatic flashbacks; cognition intact, memory function good, and concentration abilities good.  (Id.)  Dr. Syed assessed Plaintiff with bipolar I disorder, mixed; child affected by parental relationship distress; child behavior problem; fidgeting; oppositional defiant disorder; uncooperative behavior; and undersocialized conduct disorder, aggressive type, moderate.  (AR 341.)

On March 13, 2020, Clinica La Victoria AMC prepared a medical source statement (MSS) regarding functional equivalence based on the impairment of severe ADHD with behavioral problems.  (AR 354.)  Dr. Victoria opined Plaintiff had "marked" limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others, due to his difficulties paying attention, poor attitude and poor character; "no limitation" in moving about and manipulating objects; and "less than marked" limitations in caring for himself and health and physical well-being.  (AR 354–55.)

On May 5, 2020, Plaintiff (now 11 years and 5 months old) was treated by Dr. Syed with a translator for "medication management with psychotherapy" via a fifteen-minute tele-health visit (due to the COVID-19 quarantine).  (AR 368.)  Symptoms were reported as moderate.  (Id.)  Plaintiff was medication compliant and reportedly "doing better" on medications, which had been changed to Trileptal 75 mg twice/day, and Wellbutrin SR 100 mg daily.  (AR 368–69.)

**B.     The ALJ'S Decision**

Plaintiff was twelve years old at the time of the ALJ's decision on January 28, 2021.  (AR 31, 169.)  The ALJ conducted the three-step disability analysis set forth under 20 C.F.R. § 416.924(a) for claimants under the age of eighteen and issued the following findings of fact and conclusions of law:

(1)     Plaintiff was born on November 17, 2008.  Therefore, he was a school-age child on January 31, 2019, the date the application was filed, and was still a school-age child as of the date of issuance of the ALJ's decision.  20 C.F.R. § 416.926a(g)(2).  (AR 22.)

(2)     Plaintiff has not engaged in substantial gainful activity since January 31, 2019, the application date.  20 C.F.R. §§ 416.924(b); 416.971 et seq.

(3)     Plaintiff has the following severe impairments: oppositional defiance disorder (ODD); attention deficit hyperactivity disorder (ADHD); and a learning disorder.  20 C.F.R. § 416.924(c).

(4)     At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 416.924, 416.925, 416.926.  (AR 22–23.)

In reaching this determination, the ALJ stated she specifically considered the mental disorder listings 112.05 (intellectual disorder), 112.08 (personality and impulse-control disorders), and 112.11 (neurodevelopmental disorders), and determined Plaintiff did not meet the "paragraph B criteria"[3] because he did not have at least two "marked" limitations or one

---

[3] The "paragraph B" criteria consist of the following broad areas of functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing themselves.  See 20 C.F.R. §§ 416.925 (describing ALJ's special technique for evaluating paragraph B

"extreme" limitation.  More specifically, the ALJ determined Plaintiff had:

- A "moderate" limitation in the functional area of understanding, remembering, or applying information;

- A "moderate" limitation in the functional area of interacting with others;

- A "marked" limitation in the functional area of concentrating, persisting, or maintaining pace; and

- A "moderate" limitation in the functional area of adapting or managing oneself.

(AR 23–25.)

Particularly with respect to the "understanding, remembering, or applying information" area, the ALJ explained she determined Plaintiff's limitation to be only "moderate" because

> The claimant had an Individualized Education Plan (IEP) and he required specialized academic instruction, but he was in general education 100% of the time (1F, 1-18).  Writing was difficult for him.  He was producing compound sentences orally and he was working on writing them through IEP goals.  He was able to complete basic computation problems, addition, and subtraction.  During the claimant's one-time psychological consultative examination, the claimant would reportedly lose items, become frustrated easily, and have difficulty organizing material (3F).  The claimant's mother explained that the claimant was unable to complete three-step instructions and he would forget a piece.  The claimant's speech and language were normal and intact.  His thought content was within normal limits and his associations were logical and goal-oriented.  His judgment and insight were poor and younger than expected given his age.  The claimant's full scale IQ score was 59 on WISC-V testing, which was extremely low.  The claimant therefore has a moderate limitation in understanding, remembering, or applying information because of his low IQ score, but his ability to receive general education with some specialized academic instruction, and his ability to complete basic computation problems. [sic]

(AR 23.)  Meanwhile, the ALJ determined Plaintiff had a "marked" limitation in the area of concentration, persistence, or maintaining pace on the bases that

> The claimant had an IEP and he required specialized academic instruction, but he was in general education 100% of the time (1F, 1-18).  He was unable to learn and retain new skills at a reasonable pace.  He was easily distracted and often distracted others in the classroom.  He was able to follow class rules but sometimes he needed redirection.  During the claimant's one-time psychological consultative examination, his mother reported that he had difficulty

criteria), 416.926 (explaining rules for evaluating medical equivalence).

focusing and concentrating, and he was easily distracted (3F). The claimant would lose items, become frustrated easily, and have difficulty organizing material. He was hyper, impulsive, and interrupted others. During the exam, the claimant had difficulty sitting still and focusing. The claimant's attention and concentration were impaired. Because of the claimant's difficulty with focus, distraction, concentrating, persisting in tasks, and he distracted others [sic], the claimant has a marked limitation in concentration, persistence, or maintaining pace.

(AR 24.)

(5)     Plaintiff does not have an impairment or combination of impairments that functionally equals the severity of the listings. 20 C.F.R. §§ 416.924(d), 416.926a. (AR 25.)

In reaching this functional equivalence determination, the ALJ applied the "whole child" standard (*i.e.*, considered how Plaintiff functions at home, at school, and in the community; the interactive and cumulative effects of all of Plaintiff's medically determinable impairments on his activities; and the type, extent, and frequency of help Plaintiff needs) with respect to the six domains, and determined the Plaintiff had the following limitations:

- A "less than a marked limitation" in acquiring and using information;
- A "marked" limitation in attending and completing tasks;
- A "less than a marked limitation" in interacting and relating with others;
- No limitation in moving about and manipulating objects;
- A "less than a marked limitation" in caring for yourself; and
- No limitation in health and physical well-being.

(AR 24–25.)

(6)     Finally, the ALJ determined that Plaintiff has not been disabled, as defined in the Social Security Act, since January 31, 2019, the date the application was filed. 20 C.F.R. § 416.924(a). (AR 30.) On this basis, the ALJ denied Plaintiff's application. (AR 30–31.)

In support of her decision, the ALJ noted she considered all of the record evidence, as well as the testimony of Plaintiff, his mother, and Dr. Winfrey. (See AR 25–30.) However, the ALJ noted she considered Dr. Winfrey's opinion to be most "persuasive," because

Dr. Winfrey supported her testimony with detailed explanation and specific references to the claimant's medical records, including his performance upon psychological testing, his need for his IEP, as

> well as the general lack of more recent treatment records.  The subsequently received evidence of the claimant's improvement with medications and stability on medications is consistent with Dr. Winfrey's testimony (9F).

(AR 29.)  Notably, the ALJ's determinations regarding whether Plaintiff met the listings under the paragraph B criteria or functional equivalence under the six domains mirror the opinion Dr. Winfrey provided at the hearing.[4]  (Cf. AR 23–26; AR 28–29.)  In reaching her step three finding that Plaintiff did not meet the listings, the ALJ explained that she relied heavily upon Dr. Winfrey's testimony, because

> [Dr. Winfrey] provided detailed testimony regarding the severity of the limitations in the paragraph A and B criteria, and also noted that the paragraph C criteria were not met/equaled.[5]  She noted that, the claimant met A.9 for listing 112.08, and for 112.11 met A.1.a and b.  As for the paragraph B criteria, she noted that in understanding, remembering, and applying information, the scores at Exhibit 3F were not accurate, as noted by [Plaintiff's] evaluation at Exhibit 1F, which was completed by his school, and noted that his scores were considerably higher.  While there was a comment in Exhibit 5F, that he had all Fs in school, there is no support for this.  [Dr. Winfrey] did find the claimant had a moderate limitation in interacting with others, noting that the record reflects some aggression, anger, and irritability, noted at Exhibit 5F.  But she noted that he had had only two sessions, with no follow through with treatment.  The claimant testified that he played video games with his brothers, like Mario Cart.  This reflects some ability to engage in activities with others.  Doctor Winfrey did find [Plaintiff] had a marked limitation in concentration, persistence, or pace, given that he was not on any medication for the ADHD, and with medication, this area was expected to improve.  She did note that the school record noted no significant behavioral issues.

(AR 24.)  The ALJ also noted Dr. Winfrey testified she expected Plaintiff's limitations under the "paragraph B" criteria to reduce with appropriate medication and treatment.  (AR 29.)  The ALJ

---

[4] The Court notes the ALJ, in finding Dr. Winfrey's opinion to be persuasive, cites to Exhibit 8F in the administrative record.  (See AR 28.)  However, it does not appear that Dr. Winfrey provided any written opinion, and only opined as to Plaintiff's impairments during her testimony at the disability hearing, which the ALJ replicates in the portion of her decision discussing the medical opinions.  The entirety of Exhibit 8F in the record consists of Dr. Winfrey's professional CV, which is also described in the record index as "Psychologist Professional Qualifications, undated, from Nancy Lynn Winfrey."  (See Ex. 8F, AR 864–66; ECF No. 13-1 at 3.)

[5] The Court expresses some concern regarding the ALJ's comment about Dr. Winfrey's consideration of paragraph C criteria, as it pertains to the analysis of whether Plaintiff met listings 112.05, 112.08, or 112.11.  The SSA Listings expressly provide that listings 112.05, 112.08 and 112.11 have only two paragraphs (paragraphs A and B); further, the SSA Listings distinguish listing 112.05 as unique from the other 112 listings, in that listing 112.05 requires satisfaction of *either* the paragraph A or paragraph B criteria, and not both.  See 20 C.F.R. § 404, subpt. P, app. 1, listing 112.00(A)(2)–(3).

also found Dr. Winfrey's testimony "persuasive and entitled to considerable weight in reaching the conclusions as to whether the claimant met or equaled a listing because [Dr. Winfrey] is a specialist who is familiar with SSA [Social Security Administration] policy and regulations, has reviewed the complete documentary record, and has provided a detailed explanation with reference to the evidence in the record to support [her] opinion."  (AR 24–25.)  Accordingly, the ALJ fully "accept[ed] the assessment by [Dr. Winfrey] and adopt[ed] her findings" at step three.  (AR 25–26.)  Every other medical opinion was given less weight.  (See AR 29–30.)

**V.**

**DISCUSSION AND ANALYSIS**

Plaintiff raises the following issues on appeal: (1) whether the ALJ was required to develop the record after rejecting all the relevant test scores of record; (2) whether the ALJ failed to acknowledge that Plaintiff advanced from being a school-age child to the adolescent age category during the relevant time period; and (3) whether the ALJ and Appeals Council Judges were properly appointed and therefore had legal authority to adjudicate this case.  (ECF No. 15 at 6.)

**A.     Whether the ALJ Was Required to Develop the Record After Rejecting All the Relevant Test Scores of Record**

As noted, academic testing resulted in two Full Score IQ results for Plaintiff that are in the record: (1) an FSIQ of 74 from February 2016 (AR 309); and (2) an FSIQ of 59 from March 2019 (AR 337).  In general, Plaintiff argues the ALJ rejected both of these scores, thereby triggering a duty to further develop the record with new IQ testing.  (ECF No. 15 at 6–11.)  Within this argument, Plaintiff appears to proffer several alternative bases relating to the test scores, including (1) Dr. Winfrey improperly invalidated both FSIQ tests in the record, (2) even if Dr. Winfrey only invalidated the most recent IQ test, the older test was invalid per the Social Security Administration's Program Operations Manual ("POMS"), (3) the ALJ erred in adopting Dr. Winfrey's testimony and opinion because it was internally inconsistent and inconsistent with the record, (4) the ALJ erred in denying the presence of a disability learning impairment when considering the listings, and (5) the ALJ erred at step three in finding Plaintiff had only a

"moderate" limitation in the functional domain area of "understanding, remembering, or applying information."

      1.     <u>A Duty to Develop the Record Exists in the Absence of Any Valid IQ Tests</u>

As an initial matter, the Court addresses whether invalidation of both FSIQ tests would trigger the ALJ's duty to further develop the record.

Generally, "[t]he claimant has the burden of proving that [he] is disabled." <u>Smolen</u>, 80 F.3d at 1288.  However, "[t]he ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . even when the claimant is represented by counsel.'" <u>Celaya v. Halter</u>, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting <u>Brown v. Heckler</u>, 713 F.2d 441, 443 (9th Cir. 1983)).  "Social Security proceedings are inquisitorial rather than adversarial." <u>Schiaffino v. Saul</u>, 799 Fed. App'x 473, 476 (9th Cir. 2020) (quoting <u>Sims v. Apfel</u>, 530 U.S. 103, 111–12 (2000)).  The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect his own interests. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001) (citing <u>Higbee v. Sullivan</u>, 975 F.2d 558, 562 (9th Cir. 1992)).

> The ALJ is not a mere umpire at such a proceeding, but has an independent duty to fully develop the record . . . it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.  [She] must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.

<u>Celaya</u>, 332 F.3d at 1183 (quoting <u>Higbee</u>, 975 F.2d at 561).

The Ninth Circuit has explained that ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to "conduct an appropriate inquiry." <u>Tonapetyan</u>, 242 F.3d at 1150 (quoting <u>Smolen</u>, 80 F.3d at 1288).  "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." <u>Tonapetyan</u>, 242 F.3d at 1150 (citations omitted).  The regulations, similarly, provide the ALJ may order further consultative examination to "resolve an inconsistency in the evidence or when the evidence as a

whole is insufficient to support a determination or decision."   See 20 C.F.R. § 416.919a. Examples of situations under which further developing of the record may be required include when the additional evidence needed is not contained in the records of the claimant's medical sources, and when highly technical or specialized medical evidence not available from the claimant's medical sources is needed.  20 C.F.R. § 416.919a(b).  Once the duty to further develop the record is triggered, failure to do so constitutes reversible error.  See Tonapetyan, 242 F.3d at 1150–51.

Importantly, the Ninth Circuit has stressed the importance of IQ test results in evaluating a claimant's mental impairments against the requirements of the mental disorder listings:[6]

> **IQ testing plays a particularly important role in assessing the existence of intellectual disability.**  Listing 12.00 generally lays out the necessary procedures for evaluating mental disorders, including intellectual disability, and for documenting relevant objective findings.  In that listing the SSA has recognized that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability," except where a claimant is unable to complete such testing.  Listing 12.00(d)(6)(b) [20 C.F.R. § 404, subpt. P, app. 1].  At the third step of the [disability analysis], when a claimant's impairment is compared to the criteria in Listing 12.05, **three of the four criteria for intellectual disability rely in whole or in part on IQ test scores**.  (The fourth criterion applies when the claimant's incapacity precludes IQ testing.)  **Because meeting the relevant listing conclusively determines that a claimant is indeed disabled, 20 C.F.R. § 416.920(a)(4)(iii), the claimant's IQ score can be the deciding factor in a determination of intellectual disability**.
>
> . . .
>
> See Listing 12.05(B) (providing that intellectual disability may be established by "[a] valid verbal, performance, or full-scale IQ of 59 or less").   **[Further, t]he fact that IQ test results may be considered by multiple reviewing experts, as well as by the ALJ, makes it particularly difficult to conclude that any error affecting the quality of those results is "inconsequential to [an] ultimate nondisability determination," let alone to conclude that such harmlessness is "clear from the record."**

Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 931, 933 (9th Cir. 2014) (emphasis added).  Thus, standardized testing provides important information about deficits in development and

---

[6] While Garcia refers to Listing 12.05 (intellectual disorder), the Court notes the Ninth Circuit's analysis and reasoning is equally applicable here to Listing 112.05 (intellectual disorder), which is the child-based analog to Listing 12.05.

functioning in terms of standard deviations and percentiles.  20 C.F.R. § 416.926a(e)(1)(ii), (e)(2)(iii); see also Ferrel v. Comm'r of Soc. Sec., No. 2:16-CV-00126-MKD, 2017 WL 3612858, at *5 (E.D. Wash. Aug. 22, 2017) ("Limitation in this domain may be shown by poor grades or inconsistent academic performance, 'provided they result from a medically determinable mental or physical impairment(s).' ") (quoting SSR 09-3p (SSA Feb. 17, 2009), available at 2009 WL 396025).

Moreover, the Ninth Circuit expressly held that any assessment of an IQ test score must pertain to a *full* IQ test.  As the court explained, IQ is reported as three scores: verbal, performance (non-verbal), and full scale.  Garcia, 768 F.3d at 927.  In Garcia v. Commissioner of Social Security, the doctor administering an IQ test to an adult claimant only completed testing as to the performance portion, purportedly due to time constraints and the claimant's slowness.  Id. No verbal or full scale score was reported.  Id.  Nonetheless, in assessing the claimant's mental impairments, the ALJ relied on the partial IQ scores alongside other medical records to reach a determination of no disability.  Id. at 928–29.  In reversing the decision, the Ninth Circuit found the ALJ failed in his duty to supplement by not ordering further IQ testing:

> In a case, such as this one, that turns on whether a claimant has an intellectual disability and in which IQ scores are relied upon for the purpose of assessing that disability, there is no question that a "fully and fairly develop[ed]" record . . . will include a complete set of IQ scores that report verbal, non-verbal, and full-scale abilities.

Id. at 930–31.

> It was legal error for the ALJ not to ensure that the record included a complete set of IQ test results that both the ALJ and the reviewing experts could consider.  While it is not certain from the record before us that [the claimant] would have been determined to be disabled if the record had been properly developed, it is also not "clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.' "  Therefore we reverse the district court and remand with instructions to reverse the final decision of the Commissioner and to order the Commissioner to develop the record through further IQ testing.

Id. at 929 (internal citations omitted).

Based on the foregoing legal authorities, the Court concludes that if all IQ tests in the record were invalid or deemed invalid by the ALJ, as argued by Plaintiff, then the duty to further

develop the record would be triggered, such that failure to order further IQ testing or otherwise further develop the record as to Plaintiff's IQ scores would amount to reversible error.

### 2.   Both Tests Were Invalidated

Having determined an absence in the record of any FSIQ tests would trigger the ALJ's duty to develop the record, the Court addresses the parties' dispute as to whether both FSIQ tests were invalidated.

#### a.   2016 IQ Test Score

Plaintiff contends the February 2016 IQ score (AR 304) was not a valid indicator of Plaintiff's IQ as of January 31, 2019 (the application date) because the test was outdated by then, pursuant to POMS DI 24583.060.  (ECF No. 15 at 10.)  Defendant does not dispute the 2016 score was not current under POMS guidelines.  However, rather than attempting to argue the Court should not find POMS persuasive with respect to determination of this issue,[7] Defendant argues the 2016 test, while non-current, was nevertheless not invalid because POMS DI 24583.060(C)(1) permits older scores to be used for "other reasons," arguing "[POMS DI 24583.060] states that non-current IQ scores can still provide useful information for other purposes, such as whether a person's intellectual disorder began during the developmental period."   (ECF No. 17 at 25 (citing POMS GN 2483.060(C)(1), available at https://secure.ssa.gov/poms.nsf/lnx/0424583060).)   The Court finds Defendant's argument unpersuasive.

As relevant here, the text of POMS DI 24583.060 provides:

> Psychological tests for children must satisfy the same requirements as psychological tests for adults. However, there are additional guidelines that are specific to psychological tests for children.
>
> . . .
>
> IQ scores must be current to be used to meet or medically equal the requirements of listing 112.05.  IQ scores stabilize after age 16 and are generally considered current after that time.  For younger

---

[7] The Court notes that POMS (the SSA's Program Operations Manual System) is an internal SSA manual, for the internal use of SSA employees, and has no legal force and does not bind" the Administration.  See Knott v. Barnhart, 269 F. Supp. 2d 1228, 1234 (E.D. Cal. 2003) .  It can, however, be persuasive authority in discerning the Administration's interpretation, and the Court finds the POMS instructive to the instant matter.  See Hermes v. Sec'y of Health & Human Servs., 926 F.2d 789 n.1 (9th Cir. 1991) (citation omitted).

children, consider the child's age at the time of test administration and the test results themselves when determining whether IQ test results obtained before age 16 are sufficiently current for adjudication.

DI 24583.060 ADDITIONAL GUIDELINES FOR USING PSYCHOLOGICAL TESTS TO EVALUATE MENTAL DISORDERS I, SSA POMS DI 24583.060.  Further, POMS DI 24583.060 provides that, where the test is administered to a child between the ages of 7 to 16, an IQ test score of 40 or greater remains current for two years.  Id.  The guideline additionally provides:

> **NOTE**: IQ scores that are not current may still provide useful information about whether a person's intellectual disorder began during the developmental period. For example, a full scale IQ score of 88 obtained when the person was age 15 may provide evidence the intellectual disorder did not begin during the developmental period.

Id. (emphasis in original).  And POMS provides a final caveat with respect to scores that are "slightly past being current":

> When a child has not attained age 16, the IQ scores may sometimes be only slightly past the requirements for being current.  Consider how much time has passed since the test in the claim file was administered and whether the same test would be given currently. **Do not use IQ scores that are more than 6 months beyond what is considered current to determine whether the child has an intellectual disorder that meets or medically equals listing 112.05.**
>
> EXAMPLE: An 8 year old child was administered the Stanford-Binet Intelligence Scales: Fifth Edition (SB-5) and received a full scale IQ score of 65 on June 22, 2014. The scores are considered current for program purposes until June 21, 2016. The claim is being adjudicated on August 15, 2016. Because the score is less than 6 months beyond what is considered current and the SB-5 would still be the appropriate test, updated testing would generally not be required to make a determination about whether the child has an intellectual disorder that meets or medically equals listing 112.05.

Id. (emphasis added).

Applying POMS 24583.060, Plaintiff's February 2016 test became non-current as of February 2018, well before the January 31, 2019 application date, as well as the November 4, 2020 hearing and the ALJ's January 28, 2021 decision.  As such, the 2016 test was invalid for purposes of determining whether Plaintiff has an intellectual disorder that meets or medically

equals Listing 112.05.  Further, a plain reading of the guidelines upon which Defendant relies reveals that the only "useful information" a non-current score may provide is with respect to "whether a person's intellectual disorder began during the developmental period."  Id.  The specific example POMS provides to illustrate such circumstances suggest that referencing an outdated IQ score from when an individual was 15 years old (hence the score is over two years stale and the child is now over 16 years old) might "provide evidence the intellectual disorder did not begin during the developmental period."  See id.  This "other reason" plainly does not apply to the instant case, in which Plaintiff remains within the developmental period, thus, there is no need to look back in time to determine whether his intellectual disorder began before he was an adult.  Nor has Defendant identified what "other reason" the 2016 score could have been used for by the ALJ, *other than* to determine whether Plaintiff has an intellectual disorder that meets or medically equals Listing 112.05.

In sum, the 2016 IQ score was non-current and therefore invalid.  Any reliance by the ALJ on this test score for purposes of determining whether Plaintiff has an intellectual disorder that meets or medically equals Listing 112.05 would amount to reversible error.  See S.W. by & through Wanda W. v. Saul, No. CV 19-4538-PLA, 2020 WL 2218767, at *11 (C.D. Cal. May 7, 2020) (citing Garcia, 768 F.3d at 931 (finding "for the ME and the ALJ to rely on a vastly outdated IQ test as the primary rationale for determining that [the claimant's] IQ must be higher than the more recent full scale IQ score of 52 obtained in 2016, was legal error" and reversing ALJ's decision).

**b.    2019 IQ Test Score**

Plaintiff contends the ALJ invalidated the March 2019 test (AR 336–37) when she accepted and adopted Dr. Winfrey's testimony that the score was inaccurate.  (ECF No. 15 at 7–8.)  Defendant does not dispute that the ALJ invalidated the March 2019 test, but instead argues the ALJ properly relied on Dr. Winfrey's testimony to reject the March 2019 test as "unreliable based on its inconsistency with other evidence."  (ECF No. 17 at 25.)

In fact, whether the ALJ invalidated the 2019 score is best ascertained from the reasoning contained in the ALJ's decision.  In determining Plaintiff had a moderate limitation under the

paragraph B criteria of "understanding, remembering, or applying information," the ALJ specifically referenced Plaintiff's IQ score of 59 (the March 2019 test), noting the score was "extremely low." (AR 23.) Indeed, the SSA regulations indicate that an IQ score of that level generally warrants a "marked" or "extreme" limitation. See 20 C.F.R. §§ 416.926a(e)(2)(iii), 416.926a(e)(3)(iii). However, the ALJ indicates she adopted Dr. Winfrey's opinion and accorded a "moderate" rather than more severe limitation to this functional area because "the scores at Exhibit 3F [*i.e.*, the 2019 IQ score, at Ex. 3F/4–5 (AR 336–37)] **were not accurate, as noted by his evaluation at Exhibit 1F**, **which was completed by his school, and noted that his scores** [*i.e.*, the 2016 IQ score, at Ex. 1F/35–39 (AR 300–04)] **were considerably higher**." (AR 24 (emphasis added).)

Thus, as Plaintiff correctly notes, the ALJ relied on the 2016 score to invalidate the 2019 score as "inconsistent with the record."

### 3.     The ALJ's Duty to Further Develop the Record Was Triggered

Having determined the ALJ invalidated the 2019 score and that the 2016 score was non-current and therefore also invalid for purposes of determining intellectual disability, the Court finds the ALJ had a duty to further develop the record. Specifically, when the ALJ invalidated the 2019 test score, resulting in no valid IQ scores in the record, her duty to further develop the record was triggered. Garcia, 768 F.3d at 931, 933; Celaya, 332 F.3d at 1183; Tonapetyan, 242 F.3d at 1150.

In sum, the Court cannot conclude that the ALJ's decision was based on substantial evidence taking the totality of Plaintiff's impairments into account. See Alderson, 859 Fed. App'x at 27; Celaya, 332 F.3d at 1184. On this basis, the ALJ's failure to further develop the record was not harmless and remand is warranted.[8]

---

[8] Having found remand is warranted, the Court declines to address Plaintiff's remaining arguments. See Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [the claimant's] alternative ground for remand."); Augustine ex rel. Ramirez v. Astrue, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.") Nevertheless, the Court notes many of Plaintiff's additional arguments are likely meritorious. For example, reliance on non-current and therefore invalid IQ test results to invalidate current and otherwise valid IQ test results is legal error, as is relying on invalid tests to determine intellectual disability. See Garcia, 768 F.3d at 931; S. W., 2020 WL 2218767, at *11. There also remains a question as to whether the ALJ erred in rejecting the 2019 scores as "not

1

## B.    Remand

2          The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g)

3   or to order immediate payment of benefits is within the discretion of the district court.  Harman v.

4   Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an

5   administrative agency determination, the proper course is to remand to the agency for additional

6   investigation or explanation.  Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004) (citing INS v.

7   Ventura, 537 U.S. 12, 16 (2002)).  Generally, an award of benefits is directed when:

8
9
10
>           (1) the ALJ has failed to provide legally sufficient reasons for
>           rejecting such evidence, (2) there are no outstanding issues that
>           must be resolved before a determination of disability can be made,
>           and (3) it is clear from the record that the ALJ would be required to
>           find the claimant disabled were such evidence credited.

11   Smolen, 80 F.3d at 1292.  In addition, an award of benefits is directed where no useful purpose

12   would be served by further administrative proceedings, or where the record is fully developed.

13   Varney v. Sec'y of Health & Human Serv., 859 F.2d 1396, 1399 (9th Cir. 1988).

14          Here, an award of benefits by this Court is not appropriate, because the Court has

15   determined the record was not fully developed.  See Leon v. Berryhill, 880 F.3d 1041, 1047 (9th

16   Cir. 2017).  As discussed, the ALJ had a duty to further develop the record by ordering further IQ

17   testing because the record (after the ALJ invalidated the 2019 test score) did not include a

18   complete set of valid IQ scores.  Furthermore, as the Ninth Circuit noted, IQ testing plays a

19

20   accurate" based on State examining physician Dr. Winfrey's opinion, as opposed to requesting administering

21   psychologist Dr. Williamson to explain her findings.  See 20 C.F.R. § 416.962a(e)(4)(iii) (noting if there is a material inconsistency between test scores and other information in the record, the ALJ "will try to resolve" the inconsistency; and indicating tests should be interpreted by the psychologist who administered them).  Other information the ALJ

22   relied upon for her decision also appears to mischaracterize the evidence, such as: (1) the ALJ's heavy reliance on the fact that Plaintiff remained "in general education 100% of the time" without acknowledging that, in lieu of special

23   education classes, Plaintiff received daily special structured assistance from special education staff, as well as multiple accommodations (AR 266–82); and (2) The ALJ's summary dismissal of Plaintiff's mother's report

24   (through a translator) that Plaintiff had "all Fs in school" as unsupported (AR 24), without addressing the actual grades on Plaintiff's report card demonstrating well-below average grades, the majority of which were

25   "unsatisfactory," "needs improvement," and Cs to D minuses (AR 313–14).  Defendant's argument that the ALJ's decision rests firmly on "ample evidence, including . . . treatment evidence, and academic records" (ECF No. 17 at 27) also falls flat considering the absence of educational records since February 2019 (which appears to be a

26   consequence of the COVID-19 quarantine and Plaintiff's transition to full-time online classes with only a handful of other students) (see ECF No. 15 at 4), as well as medical records demonstrating only cursory findings based on 15-

27   minute tele-medicine appointments (see AR 368).  Plaintiff's argument that the ALJ applied the wrong legal standard based on Plaintiff's age-group also appears meritorious.  See 20 C.F.R. § 416.926a(g)(2) (age group descriptors for

28   evaluation of functional area of acquiring and using information); SSR 09-03P, at *4–5 (examples of age-appropriate function considerations, based on different age groups).

particularly important role in assessing the existence of an intellectual disability.  <u>Garcia</u>, 768 F.3d at 931, 933.  Particularly here, where Plaintiff was deemed to have one "marked" limitation and only needed one more to meet the listing criteria, further IQ testing could impact other aspects of the ALJ's decision, such as evaluation of the medical opinions, determination of the severity of all of Plaintiff's impairments and the combination thereof with respect to the paragraph B criteria and functional domains, and consequently the ultimate determination of whether Plaintiff is disabled.  Therefore, the Court finds the matter should be remanded for the ALJ to re-evaluate the entirety of the evidence, fully develop the record regarding Plaintiff's IQ testing, and identify legally sufficient grounds to support her decision.

## VI.

## FINDINGS AND RECOMMENDATIONS

For the reasons explained herein, IT IS HEREBY RECOMMENDED that:

1.      Plaintiff's appeal from the decision of the Commissioner of Social Security be GRANTED;

2.      This matter be REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

3.      The Clerk of the Court be DIRECTED to enter judgment in favor of Patricia Medina, on behalf of minor Plaintiff I.I.M., and against Defendant Commissioner of Social Security and to CLOSE this action.

These findings and recommendations are submitted to the District Judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  **Within fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

///

///

///

///

24

1           The District Judge will review the Magistrate Judge's findings and recommendations

2    pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within

3    the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d

4    834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

5

6    IT IS SO ORDERED.

7    Dated:   **August 10, 2022**                        _____

8                                 UNITED STATES MAGISTRATE JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28